315 So.2d 50 (1975)
Roger FARLOUIS et al.
v.
John G. LaROCK et al.
No. 10098.
Court of Appeal of Louisiana, First Circuit.
May 19, 1975.
Rehearing Denied July 9, 1975.
*51 Joseph D. Lupo, Independence, for appellants.
Joseph E. Anzalone, Jr., Amite, Fred G. Benton, Jr., Baton Rouge, and Samuel J. Dileo, Jr., Hammond, for City of Independence and fourteen named defendants.
Leonard E. Yokum, Dist. Atty., Amite, for Industrial District No. 2.
Before LANDRY, BLANCHE and YELVERTON, JJ.
YELVERTON, Judge.
This suit was brought by three plaintiffs, Roger L. Farlouis, Charles N. Thomas and R. J. Spears, taxpayers of Tangipahoa Parish, Louisiana, to obtain an accounting of public expenditures and a permanent injunction prohibiting the further expenditure of public funds for the purpose of carrying out an industrial inducement agreement between Industrial District # 2 *52 of Tangipahoa Parish and Kellwood Industries, Inc. Prior to trial on the merits Farlouis withdrew from the suit and the trial court dismissed as to him. Charles N. Thomas later died. His estate has not been substituted as a party plaintiff. Thus, the only plaintiff left out of the original plaintiffs is R. J. Spears. He prosecutes this appeal.
A detailed accounting, as prayed for by the plaintiff in this petition, was rendered at the trial court level, approved by the trial judge, and the suit dismissed as to that demand.
The appeal is from a refusal to grant a permanent injunction.
Named defendants and sought to be enjoined were the Parish of Tangipahoa, the Town of Independence, Industrial District # 2 of Tangipahoa Parish, and fourteen individual citizens of the Parish of Tangipahoa and the Town of Independence.
Generally speaking, the Parish of Tangipahoa is accused of having improperly expended public funds in connection with the procurement and establishment of an industry in the Parish near the Town of Independence.
The Town of Independence is also accused of the improper expenditure of public funds for that same purpose.
It is unclear from the pleadings and the evidence exactly what transgression of the law the Industrial District is accused of, but it is a defendant, and many of the allegations of wrongdoing are generally aimed as it as well as the other two public bodies.
The group of fourteen individual citizens were named defendants because they, acting as a group, became involved in some land transactions for the purpose of obtaining industrial sites.
It should be prominently noted at this early point in this opinion that there is no question concerning the validity of the bonds sold and delivered by Industrial District # 2 of Tangipahoa Parish, as part of the industrial inducement undertaking that brought the industry Kellwood to Independence. Counsel for plaintiff stipulated at the trial that the bonds were valid. The trial judge so held. We agree and make special mention that it is our finding that the bonds issued by Industrial District # 2 of Tangipahoa Parish in connection with the industry Kellwood, are valid and enforceable obligations of the District, in accordance with the terms and conditions of the bonds themselves and Article XIV, Section 14(b.2) of the Louisiana Constitution of 1921, and LSA-R.S. 39:991 and 39:1001, inclusive, and as they may be further defined by the construction deposit agreement and lease agreement existing between the District and Kellwood.
The parties stipulated that evidence presented at the trial on the preliminary injunction could be considered in a determination of the final injunction.
The trial judge after hearing the evidence denied the applications for injunctions and dismissed plaintiff's suit. On this appeal we affirm the trial judge in his rulings dismissing the suit and denying the injunctions as to the Parish of Tangipahoa, Industrial District # 2, and the fourteen citizens. We reverse the ruling that dismissed the suit as to the Town of Independence, and render judgment in favor of plaintiff and against the Town of Independence, enjoining the Town from expending public funds in connection with certain unfulfilled contracts which we will hereinafter explain.
First, it is necessary to describe relevant historical details in order to establish a background for a discussion of all viable issues.
BACKGROUND INFORMATION
In March of 1973 prospects became bright that a garment factory would establish near Independence in Tangipahoa Parish and would employ up to 200 people.
*53 The company which was expressing its interest in the location was Kellwood, a manufacturer of soft goods which does most of its business with Sears, Roebuck and Company. The Board of Commerce and Industry of the State of Louisiana, and the people and public officials of the Parish of Tangipahoa were understandably interested in assisting Kellwood to locate at the desired site to make available an extensive number of stable and secure job opportunities for the area.
On April 24, 1973, the Police Jury created "Industrial District # 2 of Tangipahoa Parish" for the purpose of issuing industrial inducement bonds to assist Kellwood. These bonds were to be issued pursuant to the authority of Article XIV, Section 14(b.2) of the Louisiana Constitution of 1921, and LSA-R.S. 39:991 through 39:1001, inclusive, which we will refer to from time to time as Louisiana Industrial Inducement Laws.
Once Kellwood made up its mind definitely to establish its plant near Independence, its officials let it be known that they desired immediate commencement of site preparation and the building of the necessary plant buildings. Kellwood anticipated placing the new plant into operation quickly. In order for the undertaking to be financed through application of the Louisiana Industrial Inducement Laws, certain delays were required. The authorities in Tangipahoa had first to create an industrial district. Then a lease and construction deposit agreement had to be prepared and executed between Kellwood and the Industrial District. The approval of the Board of Commerce and Industry and the State Bond Commission was also required prior to the conducting of the necessary bond election. These things were done and a bond election was held in the confines of the Industrial District.[1] The officials of Tangipahoa and Independence moved to complete these requirements as rapidly as possible within the existing framework of the law.
In the meantime, the rumors of the proposed location of the plant were affecting property values. To avoid the risk of soaring land prices, fourteen civic minded individuals, including the mayor and the city attorney and other prominent businessmen of Independence, on March 27, 1973, obtained an option to purchase approximately 19½ acres of land from the Tortorice heirs on behalf of Kellwood.
The Tortorice heirs owned two tracts of land in the area. One was a 17.09 acre site which had been selected by Kellwood as its preferred location (we will call this the Kellwood Tract). The other was a 1.6 acre tract near the municipal swimming pool in Independence. The Tortorice heirs would not grant an option on just the 17.09 acres. They wanted to sell both tracts. Hence, the option had to be taken on both tracts. The fourteen individuals took the option on March 27 for two reasons: first, as previously indicated, land prices were increasing because of the rumored industrial activity, and second, one of the Tortorice heirs had indicated reluctance to sell. It was thought necessary to take the option on March 27 when it was available.
The various land transactions involved in this case constitute one of the areas of alleged improprieties and wrongdoings complained of by the plaintiff.
The other area of alleged impropriety and wrongdoing on the part of the various defendants herein has to do with some preliminary land fill and site preparation work that was engaged in by both the Police Jury and the Town of Independence before the bonds were sold and before any bond money became available for the payment of that work.
In order to present the facts of this case as clearly as possible we will continue describing the land transactions until we *54 have completed that subject. Then we will discuss the land fill and site preparation work.
It should be borne in mind during our explanation of these events that they transpired over a period of approximately eight months, from March to October of 1973. We are not necessarily describing events in their chronological sequence.
THE LAND TRANSACTIONS
On April 23 the fourteen citizens exercised their option by entering into a contract to purchase the 17.09 acre Kellwood Tract and the 1.6 acre tract near the swimming pool. Apparently, the fourteen citizens had hoped that by the time it was necessary to exercise the option, the bond election would have been held and public funds from the sale of bonds would be available to acquire the land. That had not happened. Therefore, they felt it necessary to exercise their option and enter into a contract to buy the land from the Tortorice heirs for $32,500.
On May 7, the fourteen citizens borrowed $32,500 from the Community State Bank of Independence and consummated the purchase. The bank loan did not bear interest.
The Town Minutes of May 8, the day after this purchase, indicate that the Town officials were aware of the purchase made by the fourteen individuals and applauded it as being in the public interest.
The fourteen then sold to Kellwood the 17.09 acre Kellwood Tract for the price of $1,500 per acre, or a total of $25,635. The evidence reflects that Kellwood paid the purchase price for this acreage direct to the Community State Bank and that this was applied to reduce the note held by the bank and signed by the fourteen individuals. The fourteen suffered a loss in the sale to Kellwood at the price of $1,500 per acre, which had previously been agreed upon, in comparison to the price required to be paid by them to the Tortorice heirs.
About midyear 1973, a second industry entered the picture in Tangipahoa Parish. National Bedding Company desired to locate a plant in the area and it chose a two acre site which was to be carved out of a 3.6 acre tract made up of the 1.6 acres and another two acre tract adjacent to it which we will refer to as the Grace Hodges Two Acre Tract. The Town on July 31 was given an option by Grace Hodges to purchase the two acre tract for $6,600. The option was for seven days. On August 1 the Town granted an option to National Bedding Company to purchase two acres (out of the 3.6 acres made up of the Grace Hodges Two Acre Tract and the 1.6 acres) for a consideration of $11,275. On August 7 the Town exercised its option with Grace Hodges and purchased the two acres for $6,600. On August 27, the fourteen citizens sold the 1.6 acre tract which had theretofore been in their names to the Town of Independence for the price of $2,781.04, which was the price per acre paid by the fourteen to the Tortorice heirs. This money was paid to the bank to further reduce the $32,500 note. On September 17 the Town of Independence sold to National Bedding Company the two acres that National wanted. The sale price was $11,275 which included a real estate commission of $1,025. The amount paid to the Town by National was $10,250.
By way of summary of the National Bedding Company project land transactions, the Town paid the fourteen citizens $2,781.04 for the 1.6 acre tract and it paid Grace Hodges $6,600 for her two acre tract, amounting to a total of $9,381.04. The Town then sold out of that 3.6 acres a two acre tract for $10,250.
This resulted in a net profit to the Town of $868.96. In addition to the profit, the Town also retained title to a portion of the 1.6 acre tract and a portion of the two acre Grace Hodges Tract, those portions together amounting coincidentally to 1.6 acres, although different from the 1.6 acre Tortorice property. This 1.6 acres retained by the Town is next to the public *55 swimming pool and is available for recreational use.
Concluding the discussion of the land transactions, it should be noted that the fourteen individuals still owe $3,584 on the original $32,500 note. That note, as earlier mentioned, does not bear interest. To that extent the bank itself lost money on this transaction. There were some old houses on the Tortorice property which were sold for $500 and that amount, together with the $25,635 paid to the fourteen by Kellwood and the $2,781.04 paid to the fourteen by the Town of Independence, reduced the bank loan to $3,584, which is still owed by the fourteen.
PRELIMINARY LAND FILL AND SITE PREPARATION WORK
We will turn now to the site preparation involvement on the part of the Police Jury of the Parish of Tangipahoa and the Town officials of the Town of Independence.
After the Police Jury created Industrial District # 2, a bond election was called for the issuance of $850,000 of bonds. After obtaining the approval of the State Board of Commerce and Industry and the State Bond Commission, the election was held on June 16, and it carried overwhelmingly.
It was after the election that Kellwood officials indicated that unless site preparation and construction could begin immediately, it would be necessary for them to abandon locating the plant in the Tangipahoa area. The Police Jury and the Town of Independence entered into an informal agreement to share the work of site preparation and improvement and they agreed to begin immediately so as to appease the concerns of Kellwood. They informed Kellwood of their plan to begin immediate site preparation. The Police Jury thereupon adopted a resolution declaring a public emergency and proceeded to advertise for bids for the portion of the site improvement work it had promised to Kellwood. Without advertising for bids, the Town also proceeded with its agreed part of the site improvement work consisting of bulldozer clearing and filling of the site to grade. The Police Jury's declaration of a public emergency was dated June 19.
The Police Jury's share of the site preparation work was estimated to cost $30,000. The money was available from Federal Revenue Sharing funds. Before the expenditure was actually made, however, an opinion was obtained from the Attorney General of the State of Louisiana approving the proposed expenditure. That expenditure then became the subject of a local services agreement entered into between the Police Jury of Tangipahoa and Industrial District # 2, under the terms of which the District bound itself to repay the $30,000 from lease rental revenues to be derived from Kellwood after the sale of the bonds. The legislative auditor at this point also gave his approval to this joint services agreement. The expenditure of $30,000 by the Police Jury was for the purpose of relocating a drainage canal which served the general area, including the Kellwood property, and also the construction of a parking lot on the Kellwood Tract.
Meantime, the Town of Independence was going about its agreed portion of the work. The Town, according to the testimony of its mayor, Col. John Larock, declared an emergency and proceeded to let a contract to a Mr. Sharkey for some $1,920 to proceed with emergency bulldozer work. This was done and this contract in the amount of $1,920 was subsequently paid by the Town of Independence to Sharkey. Subsequently, the Town of Independence proceeded with the emergency filling of the Kellwood plant site. The Town divided this work into two contracts between two contractors, Philip Ragusa and Vic A. Mandella. After the fill dirt was delivered to the site by these two contractors, a dispute arose between the Town and the contractors as to the number of cubic yards the contractors calculated had been delivered and the number which the Town's engineer *56 calculated was on the site. Because of this dispute, no money has ever been paid by the Town to these two contractors. It is uncertain what amount is owed, and this is the subject of another lawsuit pending in the court below. One of the objects of our suit is to enjoin the payment by the Town of any sum, regardless of the amount of dirt actually hauled, to Ragusa and Mandella.
THE ISSUES

I
One of the plaintiff's primary contentions is that the contract for the actual construction of the plant was privately let to a contractor chosen by Kellwood without following the requirements of LSA-R.S. 38:2211, relative to advertising and letting of public contracts based upon competitive bids. Plaintiff correctly observes that this bond issue was not a limited obligation bond issue but was a pledge of the general credit of the taxing body. While conceding that Police Jury of Washington Parish v. All Taxpayers, Inc., 278 So.2d 474 (La.1973), holds that it is not necessary to follow the statutory bid procedure for plant construction with monies obtained from limited obligation bonds issued under the Industrial Inducement Laws, plaintiff argues that that case does not apply where the construction uses funds derived from the sale of general obligation bonds. He contends that the Police Jury, as the governing authority of the Industrial District, had no right to allow Kellwood to construct its plant building itself, and that the Police Jury was obligated to construct the Kellwood plant building under the Public Contract Law of Louisiana.
We disagree with plaintiff's contention. So long as the work is done pursuant to the industrial inducement provisions of the constitution and statutory law of this state, the Public Contract Law is not applicable, regardless of whether the bond issue is a limited obligation or a general obligation bond issue of the taxing authority.
The Kellwood project was undertaken under the authority of Article XIV, Section 14(b.2) of the Constitution of Louisiana for the year 1921, as amended. This provision authorizes an industrial district to issue general obligation bonds "to acquire industrial plant sites and other necessary property or appurtenances for, and to acquire or construct industrial plant buildings located within such parish, ward, or municipality, as the case may be, and may sell, lease or otherwise dispose of, by suitable and appropriate contract, to any enterprise locating or existing within such parish, ward or municipality, a plant site, appurtenances and plant building, or buildings, either, both or severally; . . ." (Emphasis supplied)
The words "acquire or construct" of the constitutional language just quoted authorizes the public issuing authority, such as Industrial District # 2 of the Parish of Tangipahoa, to acquire the industrial plant building and facilities by purchase. Indeed, such requirement was specifically spelled out in the lease agreement and in the construction deposit agreement between the District and Kellwood, here. That portion of the agreement was made known to the Board of Commerce and Industry and to the State Bond Commission, and approval of such standard and customary procedure was given. Plaintiff's contention that the Public Contract Law requires the police jury to construct the plant building is contrary to the standard and customary procedures followed throughout the history of industrial development enterprises in Louisiana, where almost without exception, the local issuing authority has acquired the industrial building, machinery, equipment and appurtenances by purchase from the industry in precisely the same manner as set out in the lease agreement and construction depost agreement here.
*57 State policy was first enunciated in Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So.2d 394. There, the Supreme Court of Louisiana upheld the constitutionality of Louisiana's Industrial Inducement Law, generally. Article XIV, Section 14(b.2) of the Constitution specifically permits the public issuing authority to "sell, lease or otherwise dispose of, by suitable and appropriate contract", the plant building, machinery, appurtenances, and land. The power to "sell" is consistent with the power to "acquire" by purchase the subject industrial plant buildings, equipment, appurtenances and land. The power of "acquisition" is based on sound public policy, which among other things, protects trade secrets which otherwise would have to be disclosed by industry if the public issuing authority had to construct the required industrial facilities. Industry, conducting its own construction program, arranges for the protection of its trade secrets where such is involved. In all industrial inducement projects, the industry is obligated to guarantee the completion of the project and the payment of all costs thereof in excess of the bond issue monies available. Further, the industry must guarantee the suitability of the facilities to the purposes for which the project is undertaken by the industry. It is preferable that the public issuing authority not become involved in adequacy of construction or the suitability of the project upon completion.
In the matter of Hebert v. Police Jury of West Baton Rouge Parish, 200 So.2d 877 (La.App.1st Cir., 1967), finding that the public contract law of this state was not applicable to industrial inducement projects, we said:
"The Public Contract Law cannot be applied to such a situation and in particular where in many instances complex industrial facilities must be constructed by manufacturers which own or have access to certain trade secrets, patents and other processes that are unavailable to general contractors. The criteria in the lease agreement establishing the purchase price for the facility fully protects the Police Jury as if public bidding were required."
In the Hebert case, revenue bonds were involved, issued under the authority of LSA-R.S. 39:991 et seq., but the principle of law is the same. See also, Kliebert v. South Louisiana Port Commission, 182 So.2d 814 (La.App. 4th Cir., 1966); Wright v. Lake Charles Harbor and Terminal District, 188 So.2d 449 (La.App.3rd Cir., 1966); and Police Jury of Washington Parish v. All Taxpayers, Inc., cited supra, which have consistently upheld Louisiana's Industrial Development and Inducement Laws.

II
Plaintiff next complains that the Police Jury of Tangipahoa Parish spent $30,000 for the purpose of constructing and blacktopping a parking lot on the Kellwood property and also the relocation of a drainage canal on that property. Plaintiff condemns this expenditure as constitutionally prohibited by Article IV, Sec. 12 of the Louisiana Constitution of 1921, as a grant of public funds for private purposes. On the facts of this case, we hold that there was no violation by the Police Jury of the constitutional prohibition and that the expenditure was proper, for the following reasons.
The $30,000 expended by the Police Jury on the Kellwood plant site, derived from Federal Revenue Sharing monies, is to be repaid under the terms of the local services agreement between Industrial District # 2 of Tangipahoa Parish, Louisiana, and the Parish of Tangipahoa. The local services agreement was entered into by these two public bodies on August 14, 1973. This agreement provides that all sums, up to the sum of $30,000 advanced by the parish are to be repaid to the parish by the Industrial District, with interest. The agreement obligates the District to pay over to the Parish monies received from Kellwood or the *58 project at any time in the future not required for debt service on bonds or for payments in lieu of taxes, until the advance is repaid in full.
Both the Police Jury and Kellwood in proceeding with the public expenditures on the project relied upon two opinions of the Attorney General of Louisiana in respect to the Constitutionality, validity and enforceability of the local services agreement. The expenditure was also called to the attention of the director of the Department of Commerce and Industry and the Board of Commerce and Industry and also received the prior approval of the Legislative Auditor of Louisiana. In view of this, there is no question of the good faith of the parish.
We do not know what portion of the $30,000 went to the expense of relocating the drainage canal which hitherto had crossed the Kellwood Tract. Whatever that amount was, that portion of the expenditure enjoys the status of having the legitimate public purpose of drainage. The drainage canal served the general vicinity of Independence in that area, not just the property of Kellwood.
The construction of the parking lot is also a public purpose, since it was part and parcel of the industrial project which Industrial District # 2 was empowered to complete. The authority of the Industrial District to use funds derived from the sale of constitutionally authorized bonds has already been discussed at length, and that authority extends to "industrial plant sites and other necessary property or appurtenances". Nothing in that constitutional provision can be construed as prohibiting the expenditure of such funds for parking lots. In fact, parking lots must have been contemplated as one of the "appurtenances" to an industrial plant.
Since the construction of a parking lot is a legitimate use of funds derived from industrial development bonds, sold pursuant to the constitutional provision, the remaining objection, insofar as the industrial district is concerned, to such an expenditure, might be that the expenditure was made in advance of the sale of the bonds. This argument is without merit. The Parish of Tangipahoa advanced these funds on the assurance of repayment, with interest, from funds produced by the bonds. The net cost to the Parish of Tangipahoa and its taxpayers is zero. The gain to the Parish was the development of an industry that hired from 170 to 200 persons. Nothing in this undertaking was violative of any constitutional provision. The expenditure was sanctioned by Article XIV, Sec. 14(b.2). The involvement of the Police Jury with the industrial district was governed by a joint services agreement entered into pursuant to LSA-R.S. 33:1324 which provides, in part:
"Any parish, municipality, or political subdivision of the state, or any combination thereof, may make agreements between or among themselves to engage jointly in the construction, acquisition or improvement of any public project or improvement, the promotion and maintenance of any undertaking or the exercise of any power, provided that at least one of the participants to the agreement is authorized under a provision of general or special law to perform such activity or exercise such power as may be necessary for the completion of the undertaking.. . ."
In this case Industrial District # 2 had been created and invested with all of the constitutional authority embodied in Article XIV, Sec. 14(b.2). It was not unlawful for the Police Jury, acting pursuant to the provisions of a joint services agreement enacted pursuant to the above constitutional authority to expend its funds for any purpose the industrial district was empowered to undertake, on the assurances of repayment with interest by the industrial district.
We have thus far been dealing with plaintiff's demands for injunctive relief insofar *59 as they apply to the Parish of Tangipahoa and the Industrial District's involvement with the site preparation work.
We have concluded that the denial of injunction by the trial judge with respect to the participation by the Police Jury and the Industrial District in this work was proper, and we affirm the trial judge in this regard.
We move now to a consideration of the role of the Town of Independence in the site preparation work.

III
It will be recalled that the Town paid one Lawrence Sharkey a total of $1,920 for preliminary bulldozer work. Sometime later the Town let two other contracts which its mayor described as emergency contracts, for dirt fill. One of these contracts was let to Vic A. Mandella and the other was let to Philip Ragusa. The work done pursuant to those contracts has not yet been paid for. It is plaintiff's position that the involvement of the Town in connection with any site improvement contract was at all times illegal and the plaintiff seeks an injunction to prohibit the Town from making payment of these illegal expenditures.
Apparently, there was some kind of informal agreement between the Town and certain Police Jurors, (although not the Police Jury as a body) concerning the distribution of the site preparation work between them. There was no joint services agreement between the Town and any public body. It was in accordance with this informal arrangement that the Town let the emergency bulldozer contract for $1,920 which was performed and subsequently paid for. It was based on this informal arrangement also that the Town let its portion of dirt fill work to Philip Ragusa and Vic A. Mandella. The reason Ragusa and Mandella have not been paid is because of the dispute as to the amount due them. A primary purpose of plaintiff in this case, as we divine his purposes, is to enjoin any payment whatsoever.[2]
A serious question is presented as to whether the Town followed the required statutory procedure for the declaration of an emergency under LSA-R.S. 38:2211, that is, a formal resolution and its timely publication. There is no evidence at all that this was done. However, there is no evidence, either, that it was not done. The only evidence in the record that exists concerning this subject is that the Mayor of Independence declared there was an emergency. Under these circumstances, the action of the Town may be protected by the presumption that exists in favor of the regularity and propriety of official proceedings unless the contrary be proved. It is not necessary for us to dispose of this question, inasmuch as we find for other reasons that the action of the Town herein was ultra vires and an injunction lies to prohibit the payment of any amount of money to Ragusa and Mandella.
The legal problem presented is this: How far can a governmental body go in spending its own funds without expectation of reimbursement for the purpose of attracting or keeping industry without running afoul of Louisiana Constitution of 1921 Article IV, Section 12, unless said governmental body is acting under the full authority of the Industrial Inducement Laws?
It has been observed earlier that the Industrial Inducement Laws in Louisiana have been consistently upheld against a multitude of constitutional attacks. No question can be raised so long as a participating public body acts within the permissible limits of the constitution and these laws. However, we have found nowhere *60 any authority that permits a public body to spend money from its general fund for actual construction purposes in connection with industry inducement without legally assured expectation of reimbursement. In the Constitution it is explicit that the authority to spend money is confined to funds derived from the sale of bonds when such expenditure is used to acquire sites or construct or improve buildings and necessary property and appurtenances thereto for industrial purposes. The proposed expenditure herein amounts to some $11,000 as estimated by the Town of Independence. According to the testimony of the Mayor, this expenditure would approach approximately one-half the annual budget of that Town. The Town of Independence had no expectation of recovery of this expenditure. Unlike the Parish of Tangipahoa, which had a joint services agreement with the Industrial District whereby the latter bound itself to reimburse the Parish out of bond funds, the Town here committed itself to expenditures which were neither from bond money nor under an agreement for reimbursement from bond money. Accordingly, this proposed expenditure of the Town cannot be sanctioned under any provision of the Louisiana Industrial Inducement Laws.
Since the Town confesses that this expenditure had no other purpose than to induce industry and facilitate its location there, obviously the expenditure cannot be supported on any other legal basis. Hence, we must conclude that the contracts for land fill with Ragusa and Mandella were void ab initio.
In the case of James v. Rapides Parish Police Jury, 113 So.2d 88 (La.App. 2nd Cir., 1959) the payment by the Rapides Parish Policy Jury of annual membership dues of $750 to the Red River Valley Improvement Association, a non-profit corporation, which existed for the purposes of promoting, aiding and encouraging the development of the Red River Valley, was declared illegal. The court recognized that the annual membership payment was intended and resulted in a worthwhile public benefit. However, the court concluded that it constituted an unauthorized departure from the specific prohibition of Sec. 12, Art. IV of the Louisiana Constitution of 1921 which prohibits the use of funds belonging to any political subdivision for any association or corporation, whether public or private. In comparing the Rapides Parish case to the instant situation, we note that the Parish of Rapides includes the City of Alexandria, and certainly it is within the permissible latitudes of judicial notice for us to comment that $750 to the Parish of Rapides is a relatively insignificant sum when compared to $11,000 for the Town of Independence.
We do not mean by this opinion to condemn reasonable expenditures from the general funds of public bodies in connection with industrial inducement where there can be no expectation of reimbursement because of the nature of the expenditure. For example, reasonable travel expenses of public bodies and their representatives for industrial inducement are legitimate expenditures as incidental, routine operating costs in the conduct of the daily business of a public body, including a municipality.
While we can, and will, enjoin the payment by the Town of Independence of any sums to Ragusa and Mandella, and to this extent we can grant the relief prayed for by plaintiff, we are powerless to grant the relief to plaintiff as to the $1,920 already expended. Kellwood, one party which plaintiff suggests should restore the money to the Town, is not even a party to this suit. The other defendants plaintiff suggests ought to be made responsible, the fourteen, cannot be responsible, simply because there is no evidence that these fourteen persons, either individually or as a group, authorized the work to be done. Nor did the Police Jury authorize by joint services agreement or otherwise this work by any suggestion of any reimbursement by the Police Jury. Nor is any suggestion made that the Industrial District was at all *61 officially involved. The evidence shows simply that the Town authorized the work as a town project and it was paid for with Town funds. The pleadings and prayer of plaintiff's petition do not permit this court in any way to grant any relief with respect to those funds.

IV
We now move to a consideration of the various allegations of wrongdoing on the part of the fourteen citizens asserted in the petition. While no relief against these fourteen individuals was prayed for other than the restoration of the $1,920 about which we have already commented, because of the attention given to the subject in his brief by plaintiff we feel compelled at this point to make some comments with regard to the propriety of the involvement of these fourteen individuals in the land transactions. It always has the appearance of impropriety for public figures to do business with a public body, particularly when these persons are members themselves of those public bodies. In such cases there is a presumption of impropriety. On the basis of the instant facts, however, that presumption has been successfully overcome. We find nothing whatsoever in the record to substantiate any suggestion that any of these fourteen individuals acted otherwise than with honest thoughts and for the common good of the people of the area. It should be noted that this was a very popular undertaking. It was voted overwhelmingly by the people of the District. The Town and Parish officials were enthusiastic in their support of the project. Even the local bank participated to the extent of loaning its funds for the property purchases without interest. All actions of the group of fourteen in purchasing the Kellwood and swimming pool tracts were not only carried out at no profit to the fourteen, but at an actual loss of $3,584. All land transactions, moreover, were given full public notoriety at official meetings of the Town of Independence prior to the consummation of the contracts.
Intertwined in his attack on the fourteen individuals is the criticism by plaintiff of the Town's involvement in real estate transactions.
This question is now moot. There is no relief which this court can grant. The Town of Independence has emerged from these property transactions with a profit of $868.96 and 1.6 acres of land. We do not mean to suggest that we adopt a Machiavellian philosophy that since the Town's transactions turned out well for the Town, there was nothing wrong with those transactions. There was. Technically, there was. But no harm has been wrought and therefore, no relief can be fashioned.
For the reasons assigned, the judgment appealed from is affirmed insofar as it affects the defendants, Parish of Tangipahoa, Industrial District # 2 of Tangipahoa Parish, and John C. Larock, Vincent F. Falcone, Charles G. Anzalone, Jr., Joseph E. Anzalone, Jr., Joe V. Calcagno, A. L. Pecoraro, Harold Overby, John Massaracchia, Anthony F. Catalano, B. J. Guzzardo, Jr., Joe D'Anna, William F. McCarthy, Mike Patanaella and Dr. Paul L. LaMarca. The judgment insofar as it affects the Town of Independence is reversed, and judgment is rendered in favor of plaintiff, R. J. Spears, and against the defendant, Town of Independence, Louisiana, permanently enjoining the Town from performing the contracts made in the year 1973 with Philip Ragusa and Vic A. Mandella. Costs are assessed to the Town of Independence to the extent it is not relieved by law from the payment thereof.
Affirmed in part and in part reversed and rendered.
NOTES
[1] Coterminous with Ward 6 of Tangipahoa Parish. Ward 6 includes the town of Independence.
[2] Curiously, Mandella, who in another action in the District Court has sued the Town for payment, in this action appears as amicus curiae on plaintiff's side, seeking an injunction against payment, and he also appears as surety on plaintiff's cost bond on this appeal.