| .MCCLENDON, J.
This is an appeal by an opponent to a proceeding validating a bond issuance to fund an economic development project in Livingston Parish that would facilitate the location of a Bass Pro Shops retail outlet in the parish. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
The Denham Springs Economic Development District (“District”) was created by City Ordinance 03-33 and adopted by a special meeting of the City Council on December 9, 2003. The geographical location of the District is a 74.85 acre tract in the Parish of Livingston, City of Denham Springs, on land south of Interstate 12 and east of Range Avenue. The current proposal, referred to as the Bass Pro Project (“Project”), includes the purchase by the District of twenty-seven acres, construction of retail facilities, including a restaurant, related infrastructures and public improvements, and subsequent location therein of a Bass Pro Shops retail outlet.[1] The Project is to be funded through the issuance of revenue bonds secured by the pledge of local government sales tax increments in accordance with La. R.S. 33:9038.1 et seq. After payment of the revenue bonds in full, ownership of the *1156 retail facility would be transferred to Bass Pro for a nominal fee.
In furtherance of this plan, a Cooperative Endeavor Agreement was drafted with the following parties participating: the District; the Parish of Livingston (“Parish”); the City of Denham Springs (“City”); the Law Enforcement District of the Parish of Livingston (“Law Enforcement”); the Livingston Parish School Board (“School Board”) (both as a tax recipient entity and as the tax collector for the Parish); Special Tax District No. 1 of the Parish of Livingston; the Denham Springs Economic Development Corporation; and the State of Louisiana through lathe Secretary of the Department of Revenue (“State”). The agreement provided for each party thereto to contribute sales tax increments toward funding the Project. The issuance of the bonds and the authority of the entities to enter into the Cooperative Endeavor Agreement received approval not only on the local level, by each participating local entities’ governing body, but also thereafter by the State Bond Commission, the Louisiana Department of Economic Development, the Capitol Region Planning Commission, and the Joint Legislative Committee on the Budget.
On March 25, 2004, the District filed a “Motion for Judgment” in the 21st Judicial District Court. Therein, plaintiff alleged that it was created pursuant to La. R.S. 33:9038.2 as an economic development district authorized to collect the “sales tax increment[s],” used to secure the issuance of bonds for the financing of economic development projects. The District further alleged its intent to issue bonds amounting to approximately $50,000,000, to be used to fund the Project. Plaintiff further alleged that said bonds would be secured by the pledge of collected sales tax increments by the participating tax recipient entities. As such, the District alleged that it had standing to seek validation of the subject bond issuance pursuant to the “Bond Validation Act,” La. R.S. 13:5121-5130.
On April 8, 2004, A. Ponder Jones filed an answer, exceptions, and defenses to the suit, alleging himself to be a taxpayer, property owner, and resident of Livingston Parish and contending the proposed bond issuance was illegal for a number of reasons.[2]
Also on April 8, 2004, the School Board filed an answer requesting the district court rule on whether the School Board could pledge sales and use tax revenues for the Project in light of La. Const. Art. VII, § 14 and whether the tax | ¿increment financing statute (“TIF”) authorizes participation of school boards in “TIF” financing where school board revenues are “expressly dedicated to specific purposes.”
On April 22, 2004, a hearing was held in the district court on the issues presented in the bond validation proceeding. Following the hearing, the district court rendered judgment declaring legal and valid: the bonds; the actions and proceedings taken and contemplated by the District in connection with the bond issuance; the Act and its authorization of the Agreement; the participation of the entities to the Agreements; the contemplated transaction granting an option to Bass Pro to purchase the Project for a nominal consideration; the purchase and contemplated lease of the twenty-seven acre tract; and, the means provided for payment of the bonds, including the pledge of sales tax revenues, lease and mortgage of the land. The district court further declared in its judgment that all legal requirements concerning publication, notice, and receipt of the motion *1157 for judgment had been met. The district court also decreed the conclusiveness of the judgment in accordance with the Bond Validation Act, and that the judgment constituted a permanent injunction against further proceedings on the issues decided. The judgment was signed April 26, 2004. This appeal by Mr. Jones followed.
On appeal, Mr. Jones makes the following assignment of errors:
(1) The trial court erred in rendering judgment validating the Bonds because the Bonds are to be secured by a Tax Increment Financing (“TIF”) scheme that uses sales tax funds specifically dedicated by the voters to other uses.
(2) The trial court erred in approving an alternative financing structure for the Bonds when that financing structure had not been finalized and thereafter was rejected by the Livingston Parish School Board.
(3) The trial court erred in rendering judgment approving the. Bonds secured by a proposed TIF scheme that amounts to a loan, | spledge, or donation of funds belonging to the state or a political subdivision, in violation of La. Const. Art. VII, § 14(A).
DISCUSSION
Because this appeal is taken pursuant to the Bond Validation Act, La. R.S. 13:5121-5130, it has been assigned expedited status. In any action affecting the validity of governmental bonds, the provisions of La. R.S. 13:5121 through 13:5130 “supercede all other acts and statutes on the subject.” La. R.S. 13:5122.
In general, review under the Bond Validation Act is restricted by La. R.S. 13:5130, which provides: “No court in which a proceeding to invalidate or sustain bonds is brought shall invalidate the bonds unless it finds substantial defects, material errors and omissions in the incidents of such bond issue. Matters of form shall be disregarded.” The arguments brought by Mr. Jones on appeal are directed toward allegedly “substantial defects.” Mr. Jones does not challenge the constitutionality of the TIF law, La. R.S. 33:9038.1-9038.10, but rather contends that its application to the particular project under consideration herein violates certain constitutional and statutory provisions, and that the alternative plan was not approved by all participating entities.[3]

Tax Increment Financing Law La. R.S. 38:9038.1-9038.10

The tax increment financing act under which the District is proceeding in this case, La. R.S. 33:9038.1-9038.10, authorizes any “local governmental subdivision” or “tax recipient entity” to participate in tax increment financing of economic development projects.[4] With respect to the sales tax increment financing involved in the instant case, La. R.S. 33:9038.4(A)(1) authorizes local government | fito issue revenue bonds to fund economic development projects, of the type described in La. R.S. 33:9038.4(M) and 33:9038.6, which may be payable from a pledge and dedication of up to the full amount of “sales tax increments.” A “sales tax increment” is defined by La. R.S. 33:9038.4(A)(2) as that “portion of the designated sales tax ... *1158 collected each year ... which exceeds the designated sales tax revenues ... that were collected in the year immediately pri- or to the year in which the district was established.” Thus, where a district is created in an area where there are no existing businesses generating sales tax revenue, the “sales tax increment” equals all sales tax revenue generated after creation of the district. However, in instances where an economic development district is created that encompasses existing businesses, the sales tax revenue existing, at the time the district is created, falls outside the definition of a “sales tax increment” and cannot be pledged to fund a bond issuance. Therefore, only tax revenue generated within the geographical confines of the economic development district, over and above existing tax revenue, can be pledged under La. R.S. 33:9038.4.
Upon passing a resolution to employ the procedure set forth in this tax increment financing law, a local governmental entity must publish notice in the official journal of the local governmental subdivision and a public hearing must be held. La. R.S. 33:9038.4(A)(3). After establishment of an economic development district, the local governmental subdivision and “each participating tax recipient entity” must designate the local sales taxes that are to be used to determine the sales tax increments, a baseline collection rate is certified, and that certification is published in the local official journal. La. R.S. 33:9038.4(0). Subject to the exceptions contained in La. R.S. 33:9038.4(A)(5), “all incremental increases in sales taxes” may be pledged for an economic development project. Further, this act declares that the powers and rights conferred therein are in addition to any other powers and rights conferred by any other general or special law, and that 17“[t]he provisions of this Section shall be liberally construed for the accomplishment of its purposes.” La. R.S. 33:9038.4(J) (emphasis added).
Loan, Pledge, or Donation of Funds Belonging to the State or a Political Subdivision, in Violation of La. Const. Art. VII, § U(A) (Assignment of Error No. 3)
In this assignment of error, Mr. Jones asserts that the trial court erred in rendering judgment approving the bonds secured by a proposed financing plan that amounts to a loan, pledge, or donation of funds belonging to the state or a political subdivision, in violation of La. Const. Art. VII, § 14(A). Mr. Jones argues that the use of the political entities’ sales tax increments to fund the development of a retail facility for use by a private business and the subsequent transfer of Project property for a “nominal fee” to a private entity, violate Article VII, § 14(A).
Article 14(A) provides, in pertinent part: “Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private.” (Emphasis added.) However, this single paragraph, relied on by appellant, cannot be viewed in isolation; the remaining paragraphs of the Article are also pertinent to this issue. Paragraph (B)(3) provides that nothing in Section 14 shall prevent “the pledge of public funds, credit, property, or things of value for public purposes with respect to the issuance of bonds or other evidences of indebtedness to meet public obligations as provided by law.” Further, Paragraph (C) specifically addresses “Cooperative Endeavors” and states: “For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any *1159 public or private | «association, corporation, or individual.”[5]
Further, La. Const. Art. VI, §§ 19 and 20 are pertinent to this discussion, and provide as follows:
§ 19. Special Districts; Creation
Section 19. Subject to and not inconsistent with this constitution, the legislature by general law or by local or special law may create or authorize the creation of special districts, boards, agencies, commissions, and authorities of every type, define their powers, and grant to the special districts, boards, agencies, commissions, and authorities so created such rights, powers, and authorities at it deems proper, including, but not limited to, the power of taxation and the power to incur debt and issue bonds.
§ 20. Intergovernmental Cooperation
Section 20. Except as otherwise provided by law, a political subdivision[6] may exercise and perform any authorized power and function, including financing, jointly or in cooperation with one or more political subdivisions, either within or without the state, or with the United States or its agencies. [Emphasis added.]
When La. Const. Art. VII, § 14, paragraph (A), is read in conjunction with paragraphs (B) and (C) of that constitutional provision, and along with La. Const. Art. VI, §§ 19 and 20, it is clear that the redactors of the Constitution expressly excepted from the prohibition against things of value owned by the state being “loaned, pledged, or donated,” the pledge and/or transfer of governmental property in conjunction with bond issuances.
Arguments such as the one made by appellant in this assignment of error have previously been rejected by the courts of this state. See Adams Industries, Inc. v. City of Monroe, 385 So.2d 896, 901 (La.App. 2 Cir.), unit refused, 393 So.2d 736 (La.1980), citing, Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259 (1934); Miller v. Police Jury of Washington Parish, 226 La. 8, 74 So.2d 394 (1954); Farlouis v. LaRock, 315 So.2d 50 (La.App. 1 Cir.1975).
The fact that the Project herein considered benefits private entities, either by disbursement of revenue bond funds to procure facilities for the use of private businesses or by the subsequent transfer of property so procured to a private entity for a nominal price upon retirement of the revenue bonds, does not render the Project violative of La. Const. Art. VII, § 14. The full measure of consideration received by a governmental entity for the transfer of property encompasses other obligations undertaken by a private enterprise, including the economic advantages to a particular parish “by providing employment directly and indirectly, by producing additional tax revenues for the [p]arish, and *1160 the other governmental agencies, by attracting satellite and kindred industries to the [pjarish, and by stimulating many collateral benefits to present residents of the [pjarish who are engaged in the business of providing supplies and services.” Hebert v. Police Jury of West Baton Rouge Parish, 200 So.2d 877, 893 (La.App. 1 Cir.), writ refused, 250 La. 1032, 201 So.2d 520 (1967). Beyond question the real consideration to the parish, in such a case, is the inducement of the company to locate an economic enterprise in the parish. Id. Thus, the value received by a governmental entity in exchange for the transfer of property, acquired through an economic development project, to a private concern, is not ascertained merely by reference to the stated price for the “sale,” but rather consideration for the transfer includes the value of the many other benefits associated with the enhanced economic resources of the governmental entity.[7]
| ^Testimony introduced at the hearing held in the instant case revealed the extent to which this Project would economically benefit Livingston Parish. Dr. James A. Richardson, a Professor of Economics at LSU, who was accepted as an expert in Economic Statistical Analysis, particularly Economic Impact Studies, testified that Livingston Parish is considered a relatively poor parish, with its residents spending less in retail than other parishes, but also having less retail establishments per person than the state average and surrounding parishes. Dr. Richardson explained that the 50 million dollar construction project would create hundreds of jobs in the parish, not only in the construction field, but also in service industries such as food and gas sales. Although the construction phase of the project would end within a few years, Dr. Richardson estimated that the first year of operation of the Bass Pro Shops retail outlet would produce 54 to 62 million dollars of new spending in Livingston Parish. Dr. Richardson projected that within a few years approximately 75 to 110 million dollars of new sales revenue would be coming into the parish on a yearly basis, along with the creation of some 500 to 700 new jobs in the parish.
With respect to sales tax, Dr. Richardson testified that in Livingston Parish, the following percentages are collected: 1 percent by the Parish; Ph percent by the City; percent by Law Enforcement; and 2% percent by the School Board. Dr. Richardson testified that within the planned District, in which no sales tax is currently generated, the parish entities have pledged 72.7 percent of the new sales tax revenue to be generated by the Project, and will retain 27.3 percent of new taxes within the District. Dr. Richardson concluded that each of these entities will be a net beneficiary even after payment of pledged tax revenues.
In the instant case, the District is comprised of undeveloped property that currently generates no sales tax revenue. Without the incentive plan offered by the state and local government entities to Bass Pro Shops to locate in Livingston|nParish, the company might decide against opening a retail center in the parish, and the District would continue to generate no sales tax revenue. If, however, by means of the proposed Cooperative Endeavor Agreement, the Project progresses and the District begins to generate the minimally projected yearly revenue of some 54 million *1161 dollars, the 9 \ percent sales tax charged by state and local government would result in 5.1 million dollars of new revenue to governmental entities that would otherwise not exist.[8]
In enacting La. R.S. 33:9038.1 et seq., the legislature has determined that use of up to the full amount of tax increments generated by a development project for retirement of the bonds .issued to fund the project is a valid and appropriate use of these funds for the public purpose of stimulating economic growth in the state.[9] We note that this statutory format specifically provides for the protection of the public’s fiscal interest by inclusion of the following safeguards: prohibiting bond issuance where existing sales tax supported debt of the local governmental | ^subdivision or tax recipient entity is or will be in default; requiring a determination that baseline revenue is sufficient to satisfy dedications and statutory charges; requiring a certification of baseline collection rates; and by-prohibiting the dedication or pledge of the baseline sales tax (i.e., the amount of sales tax collected prior to formation of an economic development district). See La. R.S. 33:9038.4(A)(4)-(5) and (C).
Consequently, we are unpersuaded by appellant’s assertion that the instant Project violates La. Const. Art. VII, § 14. Therefore, we find this assignment of error to be meritless.
*1162 Use of Sales Tax Funds Specifically Dedicated to Other Uses (Assignment of Error No. 1)
In this assignment of error, Mr. Jones asserts that the trial court erred in rendering judgment validating the bonds because the bonds are to be secured by tax increment financing that uses sales and use tax funds specifically dedicated by the voters to other uses. Mr. Jones argues that the sales tax increments contributed to the development project by some of the public entities are dedicated for a specific purpose and cannot be used for any other purpose.
Mr. Jones also asserts that the 1 percent sales tax collected by the Parish was specifically dedicated by a 2002 ordinance for the construction, maintenance, and improvements of roads and bridges in the parish, and the 2$ percent sales tax collected by the School Board was dedicated by the voters as follows: /£ percent to pay school board employee salaries and fund utilities, and 2 percent for the enrichment of school programs and construction, renovation, operation, and maintenance of the public schools.
Further, Mr. Jones cites statutory provisions requiring the dedication of sales taxes to a specific purpose as follows: La. R.S. 33:2711 authorizing up to 2% percent sales tax for municipalities and that ordinances imposing the tax specify, |13and requiring the tax be used for, the purpose for which it is imposed; La. R.S. 33:2721.6 authorizing up to 5 percent tax for parishes and school boards with proceeds dedicated for the purposes approved by the electorate; La. R.S. 33:2737 for an additional 1 percent for school boards to be used exclusively for teacher salaries and operating expenses of schools; La. R.S. 33:2737.44 and 33:2738.22 and 33:2738.24 for an additional percent for school boards to be dedicated and used exclusively for that purpose; La. R.S. 33:2740.7 creating the Livingston Parish Law Enforcement District and authorizing % percent sales tax for operations and maintenance of the parish prison and other law enforcement costs.
Thus, Mr. Jones contends the sales taxes collected by the Parish, the School Board, and the Sheriff can be used only for the purposes authorized, which do not include economic development. In contrast, Mr. Jones points out that City Ordinance No. 1038 dedicates the City’s percent sales tax for improvement to the City’s sewerage system, but states that remaining proceeds are to be used in the City’s general fund. Because the City Ordinance allows use of some sales tax proceeds in a general fund, Mr. Jones argues it is only this type of sales tax proceeds that can be pledged under the “TTF” financing law.
Mr. Jones argues that because some of the local government subdivisions have sales taxes that are appropriated only for purposes related to the specific function of the entity, tax proceeds cannot be dedicated by these entities for economic development.
Because each ordinance that imposes a tax must specify “the purpose or purposes for which [the] tax is imposed” and revenues must be used for that purpose pursuant to La. R.S. 33:2714, even revenues dedicated to a governmental subdivision’s general fund could be deemed restricted for use only for operation of that particular entity and unavailable for contribution toward economic development unless specifically authorized. Thus, adoption of appellant’s position 114would severely limit the types of entities that could participate in a tax increment financing project, contrary to what was obviously envisioned by the legislature in enacting such laws. It is specifically stated in La. R.S. 33:9038.4(A)(5) that “all incremental increases in sales taxes” may be pledged *1163 under the statute by “all participating tax recipient entities” subject to the following proviso:
[Pjrovided that such revenues may be used for such purpose, subject to dedication by other law or by proposition approved by electors voting in an election for such purpose called by the taxing authority levying the tax, unless such use is permitted and upon a prior determination by the local governmental subdivision or other taxing authority that the baseline revenue collection is sufficient to satisfy such dedications and other statutory charges, and provided that all tax recipient entities affected, other than the state of Louisiana, enter into an intergovernmental agreement with the issuer authorizing and dedicating the inclusion of such incremental increase in sales taxes.
Mr. Jones interprets this provision as applying to the various resolutions, ordinances, and statutes, authorizing the collection of sales tax by the participating tax recipient entities herein. We find that such an interpretation would render the sales tax collected by virtually every local governmental entity wholly dedicated, leaving no sales tax available to pledge toward TIF projects.
Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. The legislature is presumed to have enacted each such statute with deliberation and with full knowledge of all existing laws on the same subject. The meaning and intent of the statutory provision is to be determined by a consideration of the statute in its entirety together with all other laws on the same subject matter and a construction should be placed on the provision in question which is consistent with the express terms of the statute and with the obvious intent of the legislature in enacting it. Munden v. State, Div. of Admin., 2001-2326, pp. 4-5 (La.App. 1 Cir. 5/9/03), 849 So.2d 639, 642, writ denied, 2003-1532 (La.10/3/03), 855 So.2d 310. Thus, we must conclude that in | lsenacting La. R.S. 33:9038.1-9038.10, the legislature was mindful of other sales tax enactments and statutes requiring dedication to particular purposes and subsequent disposition of tax proceeds in accordance with those purposes.
Recognizing that pursuant to La. Const. Art. VII, § 1, the power of taxation is vested in the legislature, which acts with full knowledge of all laws on the subject, we find that in order to give the full effect intended in the enactment of La. R.S. 33:9038.1 et seq., we must liberally construe these provisions, so as not to limit participation in economic development projects authorized therein.[10] We conclude that the legislature has carved out a special niche with respect to “sales tax increments,” allowing tax recipient entities to dedicate sales tax increments, or newly generated sales tax within the limited geographical confines of an economic development district, for the funding of economic development projects formulated in accordance with La. R.S. 33:9038.1 et seq., while maintaining safeguards to protect existing sales tax collections, which continue to be applied to their , dedicated purposes.[11]
Accordingly, we interpret the limiting language found in La. R.S. 33:9038.4(A)(5) as applying solely to “sales tax increments,” and not to existing sales tax revenue in general. While existing sales tax *1164 revenue is dedicated to each entity, as appellant asserts by the resolutions, ordinances, and statutes cited, it is clear from a reading of La. R.S. 33:9038.1 et seq., the legislature intended for sales tax increments to be available for funding economic development, at each entities’ discretion, unless the “sales tax increment” itself is specifically dedicated to some other purpose. Appellant has cited no statutory or local government ordinance or resolution that dedicates the “sales tax increments” at issue herein to a purpose | ^other than economic development. Therefore, we do not find the limitation found in La. R.S. 33:9038.4(A)(5) excludes participation by the tax recipient entities in this bond issue.
Further, our review of the School Board’s dedication of sales tax increments reveals no basis for invalidating its participation in the Project.[12] We conclude that the legislature in enacting La. R.S. 33:9038.1 et seq. envisioned that “tax recipient entities,” authorized to pledge tax increments to fund economic development projects authorized by that act, would include political subdivisions of a parish or municipality and specifically contemplated the inclusion of school boards within that term.
In those instances where it is necessary to examine the intent of the legislature, a court may take judicial notice of the journals of the houses of the state legislature, as well as records of legislative committee proceedings, where preserved, as they are a matter of public record. Louisiana Public Facilities Authority v. All Taxpayers, 2003-2738, pp. 10-11 (La.App. 1 Cir. 12/23/03), 868 So.2d 124, 131, unit denied, 2004-0213 (La.3/11/04), 869 So.2d 801, citing University Properties Corp. v. Fidelity Nat. Bank of Baton Rouge, 500 So.2d 888, 906 n. 5 (La.App. 1 Cir.1986), writ denied, 501 So.2d 762 (La.1987); Heinhuis v. Venture Associates, Inc. of Louisiana, 558 So.2d 1244, 1247 (La.App. 1 Cir.), writs denied, 559 So.2d 1369, 1385 (La.1990).
We have reviewed the audiotapes of the committee meetings of both the Senate Local and Municipal Affairs Committee and the House Municipal and Parochial Affairs Committee, discussing 2002 La. Acts, No. 147, 1st Extraordinary Session, enacting La. R.S. 33:9038.1 et seq. During these committee discussions, Representative Tom McVey, the author of the bill, explained to committee 117members that a newly created economic development district generally consists of undeveloped property that would not previously have been a tax-generating area. Representative McVey explained that the act provided for the funding of economic development projects through participation by “every taxing authority” in a rural parish, such as “school boards,” creating a mechanism that attracts businesses to locate within such a district, and which thereafter establishes a new income-producing area for local government. Representative McVey indicated that the act allowed all of the local government bodies, such as “school boards,” to “put something on the table” to produce economic development in rural parishes. “School boards” were specifically enumerated as being a tax recipient entity authorized to participate in economic development projects under La. R.S. 33:9038.1 et seq.
Other economic development legislation lends guidance on this issue. In the “Cooperative Economic Development Law,” La. R.S. 33:9020-9037, enacted by 1978 La. Acts, No. 617, § 1, “any public entity” is allowed to participate in the eco *1165 nomic development format authorized therein. La. R.S. 33:9031. In contrast, La. R.S. 47:8001 through 48:8027, known as the “Tax Increment Development Act,” specifically excludes “school boards and school .districts” from the application of this act. La. R.S. 47:8003(27). The fact that the legislature has deemed it necessary to specifically exclude school boards from economic development legislation where desired, reinforces the conclusion that school boards, if not specifically excluded, can participate, to the extent limited by La. |18Const. Art. VI, § 21, in economic development projects.[13]
Our decision herein is narrowly drawn to the particular facts and circumstances of this case and the particular law at issue. In this TIF law the legislature has made a policy decision to exempt certain portions of sales tax, referred to as “sales tax increments,” from what would otherwise be its designated purpose, allowing the dedication of these sales tax increments to be made for funding of economic development in rural areas, having populations not exceeding 200,000. Because the tax base in such areas is obviously smaller than metropolitan areas and local government might otherwise have insufficient revenue to fund the type of economic development project contemplated by this TIF law, the legislature deemed it necessary to allow the pledge of the combined resources of all local tax recipient entities. Furthermore, limitations were placed on the availability of the financing format: sales tax increments can be derived only from the geographical portion of the . parish designated as the economic development district; sales tax increments consist only of newly generated sales taxes in that district; sales taxes generated prior to the economic development are protected and cannot be pledged; this format cannot be used if other obligations of the parish would be in default; and the public receives advance notice of the economic development plan and has an opportunity to raise any concerns at a public hearing.
Consequently, we find no impediment to the pledge of sales tax increments by the School Board in this instance. Accordingly, we find the district court was Incorrect in adjudicating the bond issuance and associated agreements and transactions valid and legal.
Approval of Alternative Financing Structure (Assignment of Error. No. 2)
In this assignment of error, Mr. Jones contends the trial court erred in approving an alternative financing structure for the bonds when that financing structure had not been finalized and thereafter was rejected by the Livingston Parish School Board. After a careful review of the judgment rendered by the lower court, we do not interpret the judgment as contemplating approval of an alternative plan. Moreover, having found herein the judgment of *1166 the district court to be correct in upholding the originally proposed Cooperative Endeavor Agreement encompassing the pledge of tax increment funds, the validity of an alternative plan is rendered moot. Hence, this assignment of error is preter-mitted.
CONCLUSION
For the reasons assigned herein, the judgment of the district court is affirmed. All costs of this appeal are assessed to appellant, A. Ponder Jones.
AFFIRMED.
PETTIGREW, J., dissents and assigns reasons.

. The Project also envisioned the development would attract subsequent construction and location within the District of a hotel and additional retail outlets.

. Although in his "Answer and Exceptions,” Mr. Ponder raised numerous challenges to the bond issuance, only three issues are before this court on appeal.

. We note that Mr. Jones attempted to assert the unconstitutionality of La. R.S. 33:9038.1-9038.10 in the lower court; however, the District objected during its closing argument at the hearing of the matter, asserting that the state attorney general had not been notified of the challenge in accordance with La. C.C.P. art. 1880. See also La. R.S. 49:257(B). Mr. Jones has not renewed his constitutional challenge to this TIF law on appeal.

. This act is restricted to municipalities and parishes with populations of not more than 200,000. La. R.S. 33:9038.1(3).

. We recognize that the provisions of La. Const. Art. VII, § 14(C) have been held not to be an exception to the prohibition contained in paragraph (A) in City of Port Allen, Louisiana v. Louisiana Municipal Risk Management Agency, Inc., 439 So.2d 399 (La.1983), as cited by appellant; however, in the instant case, both paragraphs (B)(3) and (C) are implicated. City of Port Allen is also distinguishable from the instant case in that at issue therein were the provisions of La. R.S. 33:1349(C), purporting to impose solidary liability on local political subdivisions; the validity of a bond issuance vis-á-vis La. Const. Art. VII, § 14(B) was not considered in that case. Therefore, City of Port Allen is not applicable to the issues presented for review herein.

. “Political subdivision” is defined by La. Const. Art. VI, § 44(2) as “a parish, municipality, and any other unit of local government, including a school board and a special district, authorized by law to perform governmental functions.” (Emphasis added.)

. In fact, La. R.S. 33:4717.2 provides: “In determining the consideration for any transfer, the governing authority of the political subdivision may consider the potential value of the economic impact of the enterprise being induced to locate or expand within, outside of, or adjoining the political subdivision, as well as the value of the lands, buildings, or other properties involved.”

. In the instant case, the state has pledged one-half of its 4 percent sales tax, while the local government entities have pledged 72.7 percent of their collective 5.5 percent sales tax. Under the minimum projected first year revenue of 54 million dollars, of the approximately $2,160,000 in state sales tax revenue generated, some $1,080,000 would go toward payment of the bond issuance debt; of the approximate $2,970,000 in local government sales tax revenue generated, some $2,159,190 would go toward payment of the bond issuance debt and the local governmental entities would retain approximately $810,810 of new revenue each year. Under the maximum projected revenue scenario of 110 million dollars yearly, approximately $4,400,000 in state sales tax revenue would be generated, with some $2,200,000 going toward payment of the bond issuance debt; and, of the approximate $6,050,000 in local government sales tax revenue generated, some $4,398,350 would go toward payment of the bond issuance debt, with the local governmental entities retaining approximately $1,651,650 of new revenue each year. Upon retirement of the bonds, the governmental entities would receive 100 percent of the sales tax revenue generated each year.

. The statute declares that "[bjonds which are issued under this Part are declared to be for an essential public and governmental purpose. ..." La. R.S. 33:9038.8(H). The legislature has also expressed the intent that protection of the tax base from which local political entities derive their, funding is a valid "purpose” for these entities. In this regard, it was stated in La. R.S. 33:9021: "The maintenance of the economy of the several local governmental subdivisions of the state at a high level is a matter of public policy and the cooperative economic development activities and powers prescribed and conferred by this Chapter are for a public purpose for which public money may be expended. As the maintenance of the economies of said local political subdivisions at a high level is found and declared to be a public purpose, the state's assistance to areas and regions of substantial and persistent unemployment, underemployment, and other forms of economic distress is necessary for the employment of effective steps in the planning, promotion, and financing of local economic development.” (Emphasis added.) "Enhancement of the tax base” of public entities was recognized as a valid public purpose in La. R.S. 47:8027. Because of the heightened emphasis placed on the need for economic development expressed by the legislature and the obvious intent to allow individual local governmental entities to share in the financing of such ventures that will result in increased revenues for each, economic development and the enhancement of-future revenues is a valid purpose of local governmental entities.

. The legislature has mandated that the provisions of La. R.S. 33:9038.1 et seq. be liberally construed for the accomplishment of its purposes. La. R.S. 33:9038.4(J).

. As no constitutional challenge has been levied against La. R.S. 33:9038.1 et seq., we express no opinion herein as to the constitutionality of the legislation at issue.

. It is evident from the record that appellant is particularly concerned with the pledge by the school board of its funds, as exhibits in the district court proceeding indicate Mr. Jones has served as a School Board advisor in the past.

. The legislature is charged by La. Const. Art. VIII, § 9 with the creation' of parish school boards; therefore, school boards are invested with such powers as have been confided to them by the legislature. See State ex rel. Golson v. Winn Parish School Bd., 9 So.2d 342, 344 (La.App. 2 Cir. 1942). The general powers and duties of parish school boards are set forth in La. R.S. 17:1 et seq., and include extensive fiscal and property management authority. In its exercise of the legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit. Louisiana Public Facilities Authority v. Foster, 2001-0009, p. 14 (La.9/18/01), 795 So.2d 288, 298. We have interpreted herein the provisions of La. R.S. 33:9038.1 to include participation as a "tax recipient entity” any school board located within a municipality or parish having a population of not more than 200,000. No constitutional challenge to this statute has been properly presented to this court. Therefore, we express no opinion as to whether the provisions of La. R.S. 33:9038.1 infringe upon any provision of the constitution.